BERNARD J. SEMEL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Semel v. Commissioner
Docket No. 5303-71.
United States Tax Court
T.C. Memo 1974-52; 1974 Tax Ct. Memo LEXIS 270; 33 T.C.M. (CCH) 248; T.C.M. (RIA) 74052; February 28, 1974, Filed Werner Strupp, for the petitioner. C. B. Norris, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1967 in the amount of $7,840.99. The only issue for decision is whether under the provisions of section 1239, I.R.C. 1954, [1] petitioner should have treated a payment *271 received in 1967 on an indebtedness arising from the sale of patents in 1964 to B. J. Semel Associates, Inc., as ordinary income rather than capital gain. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, a married person who filed a separate return for the calendar year 1967 with the district director of internal revenue, Baltimore, Maryland, had his legal residence at the time of the filing of the petition in this case, in Washington, D.C. On or about November 5, 1963, B. J. Semel Associates, Inc., was incorporated under the laws of the District of Columbia. On November 6, 1963, an organization meeting of directors of B. J. Semel Associates, Inc., was held. The minutes recite that present were: John G. Lawrence, Jeanette M. Kane, and Mildred Belgrad, who were all of the directors of the corporation Mildred Belgrad is a sister of petitioner. Jeanette M. Kane (hereinafter referred to as Jeanette) had come to work as petitioner's secretary in 1962. At that time petitioner was the sales manager of a company engaged in the business of selling fireworks. Petitioner *272 was the primary salesman for the business with other salesmen working with him, one of whom was John G. Lawrence. In the fall of 1963, the company for which petitioner and Jeanette were working folded and petitioner opened the business that was incorporated as B. J. Semel Associates, Inc., to engage in the business of the sale of fireworks. At the time the incorporation of B. J. Semel Associates, Inc., was being planned, Jeanette asked petitioner if she could buy stock in the company since she "wanted to get in on the ground floor" with the company. Petitioner told her that she could buy stock in the company. The minutes of the organization meeting of the directors of B. J. Semel Associates, Inc., held on November 6, 1963, show that an election of officers was held, at which John G. Lawrence was elected president and treasurer and Jeanette M. Kane was elected vice president and secretary. These minutes recite resolutions approving the bylaws and seal of the corporation, the form of stock certificate, the authorization to the treasurer to procure the necessary books for the transaction of corporate business, the selection of a bank for the corporation, and further recite: *273 Upon motion duly made, seconded and unanaimously [sic ] carried, it was RESOLVED that the Corporation issue and deliver to Jeannette [sic ] M. Kane one hundred shares of common stock for $1,000.00 paid to the Corporation by the said Jeannette M. Kane. On November 6, 1963, a certificate for 100 shares of B. J. Semel Associates, Inc., stock was issued to Jeanette the certificate being signed by Jeanette as secretary and John G. Lawrence as president. Subsequently, the certificate was canceled and the copy of the canceled certificate which was contained among the records of B. J. Semel Associates, Inc., shows an endorsement in blank on the back of the certificate signed by Jeanette and witnessed by John G. Lawrence, there being no date on the endorsement. Jeanette paid the $1,000 for the certificate, part of the payment at least being out of bonuses or pay checks due her by the company she and petitioner had worked for prior to the incorporation of B. J. Semel Associates, Inc. From November 6, 1963 until October of 1965, there was no other stock issued by B. J. Semel Associates, Inc., and the 100 shares issued continued to stand in Jeanette's name. Petitioner was familiar *274 with the fireworks business and was the general manager of B. J. Semel Associates, Inc. At a special meeting of the stockholders, officers and directors of the corporation held on November 26, 1963, petitioner was elected the corporate treasurer. At a similar meeting held on March 9, 1964, a new president, Sidney M. Ziring was elected. At that time John G. Lawrence resigned as president and director of the corporation. Between the time John G. Lawrence resigned and February 8, 1965, James M. Piccolo became a director of the corporation and at a meeting on February 3, 1965, he was elected president. On February 10, 1965, a special meeting of the stockholders and directors of B. J. Semel Associates, Inc., was held to take action with respect to a proposed loan to the corporation from Irving R. Wisch and Richard Wisch. Irving and Richard Wisch are brothers-in-law of petitioner. The minutes of this meeting show the only stockholder as Jeanette M. Kane and the directors as Jeanette, James M. Piccolo, and Mildred Belgrad. However, by resolution, petitioner was to act as chairman of the meeting and Jeanette as secretary. The minutes recite as follows: Mr. Semel then stated *275 that in order for the Corporation to carry on its business presentably it is absolutely essential that it borrow the sum of $25,000.00 in order to finance the purchase of merchandise for resale to the corporation's customers. That he was in contact with IRVING R. WISCH and RICHARD WISCH, in New York, and they consented to loan to the Corporation the sum of $25,000.00 upon the following terms and conditions: 1. That the loan of $25,000.00 be repaid by July 31, 1965, with interest at the rate of one and one-half (1 1/2%) per centum per month on any unpaid balance. 2. That BERNARD J. SEMEL personally guarantees payment of the said loan. 3. That all of the issued and outstanding stock of the Corporation be deposited with them as collateral security for the repayment of the said loan. 4. That all of the officers and directors execute and deliver resignations to take effect upon default in the payment of said loan. 5. That the Corporation, as additional consideration to IRVING R. WISCH and RICHARD WISCH for making said loan, agrees to pay to them one-third (1/3) of the net profits of the Corporation realized between January 1, 1965 and September 30, 1965. After a general *276 discussion at which all present participated, it was, upon motion duly made and seconded unanimously. RESOLVED, that the Corporation borrow the said sum of $25,000.00 from IRVING R. WISCH and RICHARD WISCH, upon the conditions aforesaid, and that BERNARD J. SEMEL, the Treasurer, be and he hereby is authorized to execute any and all documents necessary and proper to effectuate the transaction and that the President and Secretary likewise are authorized to execute any and all documents and certificates necessary to effect the transaction. On February 27, 1965, at a meeting of the stockholder and officers of B. J. Semel Associates, Inc., petitioner's resignation as treasurer was accepted, and at a special meeting of March 1, 1965, James M. Piccolo was elected treasurer of the corporation. The minutes of a special meeting of the stockholder and officers of B. J. Semel Associates, Inc., held on March 1, 1965 recite: A Special Meeting of the stockholders was held on March 1, 1965 for the purpose of accepting the resignation of B. J. Semel as a Director. All of the directors and stockholders waived notice of the time, place and purpose of the meeting. Upon motion duly made, *277 seconded and unanimously carried, the resignation of B. J. Semel as a Director of B. J. Semel Associates, Inc. was accepted. In October 1965 Jeanette reached the opinion that B. J. Semel Associates, Inc., was in financial trouble and went to petitioner and told him that she wanted her money back and would give him the stock back. Petitioner paid Jeanette $1,000 in October 1965 and her stock certificate was canceled. Jeanette continued to work for petitioner up until 1972, except that for a 2-year period beginning approximately at the time Jeanette's stock in the corporation was canceled in October of 1965 until the fall of 1967 she did not work. When Jeanette came back in 1967 to work for petitioner, he was no longer connected with B. J. Semel Associates, Inc., but was connected with another company. While Jeanette was secretary of the corporation she took notes at the meetings of the stockholders and directors and sometimes she typed these up herself and at other times they were typed up by someone in the office of the lawyer retained by the corporation. On or about January 1, 1964, petitioner sold to B. J. Semel Associates, Inc., certain patents for approximately $53,000. *278 The 1964 corporate income tax return of B. J. Semel Associates, Inc., reported a loss of $15,077.02 and on the 1965 corporate income tax return of B. J. Semel Associates, Inc., a loss of $11,902.60 was reported. The balance sheets as of the beginning of the years 1964, 1965, and 1966 shown on these returns are as follows: 1964
1965 ASSETS
Amount
Total Amount
Total
Cash
$1,000.00
Notes and accounts receivable
$18,864.23
(a) Less reserve for bad debts
$18,864.23
Inventories
12,338.23
Other Current Assets(Deposits)
6,571.47
Buildings and other fixed depreciable assets
58,297.23
(a) Less accumulated amortization and depreciation
4,672.88
53,624.35
Other assets
total assets
$1,000.00
$91,398.28
LIABILITIES AND CAPITAL
Accounts payable
$105,475.30
Loans from stockholders
Capital stock: (a) Preferred stock
None
None
(b) Common stock
$1,000.00
$1,000.00
$1,000.00
$1,000.00
Earned surplus and undivided profits
($15,077.02)
Total liabilities and capital
$1,000.00
$91,398.28
1966 ASSETS
Amount
Total
Cash
$6,432.76
Notes and accounts receivable
$28,712.90
(a) Less reserve for bad debts
28,712.90
Inventories
23,173.42
Other current assets (Deposits)
21,152.39
buildings and other fixed depreciable assets
58,346.72
(a) Less accumulated amortization and depreciation
9,265.20
49,081.52
Other assets
560.00
Total assets
$129,112.99
LIABILITIES AND CAPITAL
aCCOUNTS payable
$91,015.59
Loans from stockholders
24,000.00
Capital stock: (a) Preferred stock
(b) Common stock
$26,000.00
$26,000.00
Earned Surplus and undivided profits
($11,902.60)
Total liabilities and capital
$129,112.99
*279 00 $91,398.28 $129,112.99 On the corporate income tax return filed by B. J. Semel Associates, Inc., for the calendar years 1964 and 1965, in answer to question I. (2), appearing on page 3, "Did any corporation, individual, partnership, trust, or association at the end of the taxable year own directly or indirectly 50 percent or more of the corporation's voting stock?" the box "No" was checked. Petitioner on his original income tax return for the calendar year 1967 reported a long-term capital gain of $24,412, stated to be from "trademarks" acquired in 1960 and sold in 1967. On January 9, 1969, petitioner filed an amended return reporting an increase in the long-term capital gain previously reported to $39,344.27. Respondent in his notice of deficiency increased petitioner's income as reported, and insofar as here pertinent gave the following explanation: It is determined that the proceeds in the amount of $39,344.27 received in 1967 from the sale of patents in 1964 to B. J. Semel, Inc. constitute ordinary income to you under section 1239 of the Internal Revenue Code instead of a long-term capital gain as reported on your return. Therefore, your taxable *280 income is increased in the amount of $18,151.83, computed as follows: Amount received in 1967
$39,344.27
Less: Basis of patent
1,520.00
Ordinary gain
$37,824.27
Gain previously reported
19,672.44
Adjustment
$18,151.83
OPINION Section 1239[2] provides in the case of a sale or exchange, directly or indirectly, of depreciable property between an individual and a corporation, more than 80 percent in value of the outstanding stock of which is owned by such individual, any gain from the sale shall be ordinary income and not capital gain. *281 Respondent in his notice of deficiency made specific reference to the gain which petitioner had when he received payment in 1967 from the sale of patents in 1964 to B. J. Semel Associates, Inc., constituting ordinary income under section 1239. At the trial respondent further stressed the fact that it was his position that petitioner held more than 80 percent in value of the stock of B. J. Semel Associates, Inc., in 1964 at the time the patents were transferred to the corporation. Petitioner's counsel likewise stated that the sole issue before the Court was whether petitioner in 1964, when the patents were sold to the corporation, owned more than 80 percent in value of the stock of that corporation. The parties stipulated that the sale of the patents by petitioner to the corporation took place in 1964. Both parties recognize the issue here to be purely an issue of fact. At the trial petitioner presented testimony of two witnesses. One was an attorney who in effect testified that since April of 1968 he had been attempting to obtain the records of B. J. Semel Associates, Inc., from the date of its incorporation through the period ending in the first few months of 1968. He *282 further explained how these records came into his possession approximately 4 weeks before the date of the trial in this case. The other witness called by petitioner was Jeanette who had been the secretary of B. J. Semel Associates, Inc., from the time of its incorporation until October 1965 when she stopped working for approximately a 2-year period. She identified many of the documents contained in the records which the attorney had received in response to his request for all of the records of B. J. Semel Associates, Inc. While it was apparent that the documents which had been received as all of the available records of B. J. Semel Associates, Inc., by the attorney who testified were probably not in fact complete, there is nothing in the record to indicate that the documents were not complete insofar as they bear on the issue in this case. These documents show the only issued and outstanding stock of B. J. Semel Associates, Inc., from November 6, 1963 until October of 1965 to be the 100 shares issued to Jeanette. They show payment by Jeanette for the stock and throughout show her as the only stockholder. These documents support Jeanette's testimony to that effect. She specifically *283 testified that she verified "that the stock had actually been mine." It is clear from Jeanette's testimony that she, and apparently the other directors of B. J. Semel Associates, Inc., considered petitioner to be in charge of the business. It is also apparent from Jeanette's testimony that she was not privy to petitioner's complete plans for the business. Her explanation of her discussion with petitioner about the purchase of some of the stock of B. J. Semel Associates, Inc., may be summarized as follows: I told Mr. Semel I wanted a good chunk of the stock in the company because I had two small children and I wanted to make a lot of money fast so I could stay home with them and that's being very blunt but I know that was the basis of the conversation. * * * He told me I could have as much as I wanted. * * * I remember talking price with the man and it - it was all the shares for $1,000.00 and I told him I would take it but when I saw the company folding or going under financially, I went back again to Mr. Semel, laid the cards out on the table and told him I could not afford to take any kind of a loss - that I just didn't - I didn't want to become involved in it. *284 * * * He was very - he took the stock back - he didn't say much. * * * Yeah. I mean, he arranged with the lawyer to - for me to turn back the stock certificates and everything - the stock certificate - it was just the one. In this state of the record and no other evidence, we must determine whether petitioner has carried his burden of proof. [3]
*285 Respondent on brief recognizes what has been shown in this record but asks us to conclude from these facts contrary to the specific testimony of Jeanette, that Jeanette held the stock of B. J. Semel Associates, Inc. merely as a straw man or agent for petitioner. With no evidence whatsoever to this effect in the record and with other assumptions being equally valid, we are confronted with evaluating the evidence here offered. As we stated in Estate of Albert Rand, 28 T.C. 1002, 1006 (1957), It is elementary that the burden of proof rests with the taxpayer. In this case the evidence is overwhelmingly in favor of the petitioner. To view it otherwise would be to disregard substantially all of the uncontradicted testimony. This we cannot do. Where, as here, the taxpayer presents credible, competent, and relevant evidence on every necessary element, the presumption in favor of the Commissioner's determination disappears and, absent any law questions, the outcome of the case depends upon the preponderating weight of the evidence. The evidence here shows that during the entire year 1964 all the issued outstanding stock of B. J. Semel Associates, Inc., was held by *286 Jeanette. We have set forth the balance sheets of the corporation as of December 31, 1963, 1964, and 1965 in our findings since these balance sheets show the only corporate equity as of December 31, 1963, to be the $1,000 paid for the stock by Jeanette. As of the end of the year 1964 the corporation had liabilities in excess of assets and was indebted to petitioner for the entire $53,000 shown as the value of the patents that were transferred to the corporation. In this state of corporate affairs, it is not totally unreasonable that the only stock should be that held by Jeanette unless the $53,000 of indebtedness to petitioner were to be in effect considered an equity interest in the nature of stock and such a view is contrary to respondent's own determination in his notice of deficiency. The record clearly shows that petitioner controlled B. J. Semel Associates, Inc., from the standpoint of management. However, the reference in the statute is not to this type of control, but rather to the individual's owning more than "80 percent in value of the outstanding stock" of the corporation. As we pointed out in 10-42 Corp., 55 T.C. 593 (1971), the legislative history of section 1239 *287 shows that Congress intended a restricted application of the section. We are certainly aware that petitioner may have permitted Jeanette initially to purchase the entire corporate stock for the purpose of having his sale to it of the patents not fall within the provisions of section 1239 without ever informing Jeanette as to the reason for permitting her to purchase all of the stock. However, there is no evidence to indicate to this effect. At the beginning of the trial, after petitioner's counsel had stated that petitioner would not be present at the trial because of having been detained on business in Taiwan, the Court specifically asked respondent's counsel whether he was surprised by petitioner's amendment to his petition and needed any further time, and respondent's counsel replied that he was prepared to go forward with the case at that time. In the state of this record, we conclude that petitioner has offered sufficient evidence to carry his burden and therefore hold that petitioner's sale of patents to B. J. Semel Associates, Inc., did not result in the gain on the sale being ordinary income because of the provisions of section 1239. We have decided the only issue *288 raised in the petition in favor of petitioner, but since it is not clear whether the adjustments in the deficiency notice are made from the amended or original return, Decision will be entered under Rule 155. Footnotes
1. All references are to the Internal Revenue Code of 1954. ↩
2. SEC. 1239. GAIN FROM SALE OF CERTAIN PROPERTY BETWEEN SPOUSES OR BETWEEN AN INDIVIDUAL AND A CONTROLLED CORPORATION. (a) Treatment of Gain as Ordinary Income. - In the case of a sale or exchange, directly or indirectly, of property described in subsection (b) - (1) between a husband and wife; or (2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren; any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231. (b) Section Applicable Only to Sales or Exchanges of Depreciable Property. - This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167. * * * ↩
3. The original petition in this case made the following allegation of fact: The sale of patents by the petitioner to B. J. Semel Associates, Inc. took place in 1964. The said corporation was formed on or about November 15, 1963. From the inception of the corporation's existence, it had been agreed that the petitioner would own 66.66% of the capital stock and the remainder would be owned equally by Richard Wisch and Irving R. Wisch. A formal agreement to evidence such stock ownership was entered into on October 3, 1965. The petitioner contends that since a binding agreement existed at the time the patents were transferred according to which the petitioner would own less than 80% of the outstanding stock, and no stock was owned by other persons described in section 1239(a) of the Internal Revenue Code, the proceeds from such transfer are to be taxed as a sale of a capital asset rather than as ordinary income. At the trial petitioner's attorney stated that petitioner wished to amend his petition to delete that allegation and substitute therefor the following: The said corporation was organized on or about November 5, 1963. From November 6, 1963 to October 1, 1965, all of the issued and outstanding capital stock of said corporation was owned by Jeannette [sic ] M. Kane. Therefore, the petitioner did not directly or indirectly own any of said stock at the time the patents were transferred and Section 1239 of the Internal Revenue Code does not apply.
Petitioner's motion to so amend the petition was not objected to by respondent and was granted by the Court. The written amendment to the petition was subsequently filed. ↩